United States District Court
Southern District Of West Virginia

FILED
JUN 10 2016
TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia
1:16-5271

Christian Pearson Reg No. 04720-061 : Complaint
Plaintiff,

Jury Trial
-Against-                                Demand

J. Stock, M. Rife, Mouse (First Name Unknown To Plaintiff), and, Kelly Lucas, Sued in their individual capacities.
　　Defendants.

This is a Joinder action filed by Christian Pearson, a federal prisoner, for damages and injunctive relief, under both a Bivens Action, and the Federal Tort Claims Act, alleging, negligence, inadequate medical care, and deliberate indifference in violation of the Eighth Amendment to the United States Constitution.

Jurisdiction
1. The Court has jurisdiction over the plaintiff's claims of violations of federal constitutional rights under 28 U.S.C. §§ 1331 and 1221.

2. The Court has jurisdiction over this action pursuant to: Title 28 U.S.C. Section 2671, et. seq. (FTCA) and

Title 28 U.S.C. Section 1346 (b)(1).

Parties

1. The plaintiff Christian Pearson, was incarcerated at F.C.I. McDowell Correctional institution ("McDowell") during the events described in this complaint.

2. Defendant J. Stock is the inmate counselor for A-1 Unit inmates. He is sued in his individual capacity.

3. Defendant M. Rife is the Unit Manager, and the over-all supervisor of the Unit Team, having the responsibility of maintaining the supervision and well being of inmates housed within the unit(s). She is sued in her individual capacity.

4. Defendant Mouse is the correctional lieutenant in charge of the Segregated Housing Unit (S.H.U.)

5. Defendant Martinez is the Correctional Captain for Security at McDowell and is in charge of the supervision and discipline of all correctional staff. He is sued in his individual capacity.

Introduction

The basis of Petitioner's (respectfully hereinafter "Pearson") complaint, arises from negligence, retaliation, and deliberate indifference to institutional safety and well being of an inmate in the custody of B.O.P. officials.

Prior to the incident, to which Pearson avers to as the reason for this current action, he would like to apprise this Honorable Court, that there was already an air of angst against complainant; for filing Administrative Remedies concerning reasons related to this complaint.

**COMPLAINT**

1. On 3/10/14, Pearson underwent 'Reconstructive Ankle Surgery.' As part of the post-operative procedures, Pearson was placed in a walking hard cast. Also, a set of crutches were used to help support petitioner due to an inability to bear weight on the surgically repaired leg.

2. Upon Pearson's return to F.C.I. McDowell, he was assigned to a smaller three(3) man cell; these cells are hard pressed for space, making movement dangerous for someone in the medical condition Pearson was in at the time.

3. Proper protocol called for Pearson to be assigned, at least temporarily to one of the medical accessible cells on his unit, which were suitable to his condition. Yet, the Unit Team chose to follow their own in-house policy; that those released from SHU are systematically placed in three(3) man cells.

4. Pearson brought forth a spoken request to Unit Counselor J. Stock, explaining that he was having difficulty in negotiating toilet duties; especially in the night, and that trying to navigate these and other procedures while on pain medication was hazardous.

5. Because of the previously mentioned "in-house" policy Mr. Stock adamantly refused to conditionally consider the request. Pearson was threatened by Mr. Stock, to be thrown into SHU; if Pearson couldn't work it out? This occurred on 3/14/14.

6. The next day, Pearson spoke to the Counselor's immediate supervisor, Ms. M. Rife (Unit Manager). He was told that the issue would be addressed with Counselor Stock. After waiting for a week, with nothing coming to fruition concerning his request, Pearson spoke to the A.W. of programs, and was told the situation would be looked into. A week later after hearing nothing, the complaint was brought to Warden B. Masters; who also said the situation would be assessed.

7. Pearson went as far, as to ask another Unit Manager, a Mr. Chamblee whom Pearson had a rapport with; if he would allow him to move to a medical cell within his unit. Being empathetic to Pearson's plight, Mr. Chamblee conferred with Ms. Rife; and a few days later it was emphasized in so many words that Pearson's Unit Team was acting indifferent because of his then current administrative complaints over his ankle and taking an in-house situation to higher officials. Therefore the move to another Unit was blocked.

8. Prior to the incident, all in-house informal resolutions were exhausted; as recommended before grievances are actuated by inmates in order to resolve complaints. Pearson followed the chain of command, and still his concerns for his personal safety went unchecked.

## Reasoning For The Request Of A Medical Cell

Pearson's reasoning, as to why a medical cell should've been administered in relation to his post-op medical care and over-all safety are as follows:

1. Due to the nature of the surgical procedure and having been placed in a cast, also the painkillers Pearson was placed on; all of the above qualified him as a "fall risk." (As he was categorized at the

hospital). Also the cell room floors of the FCI are concrete, with a sealer/wax application which creates slippery terrain; which made the hard cast incompatible for walking on.

2. The medical cells have abundant floor space, so that in case of a fall a person would be less susceptible to major injury; by hitting a sink, locker, or bed frame. There are medically strategic placed handrails/rails for those who can't fully support themselves while performing toiletry duties. Also, the sink is placed behind and away, not directly beside the toilet as in the cell Pearson was assigned to. (The positioning of the sink played a vital position in the injuries sustained to Pearson). These medical cells were being utilized as merit cells, due to size and their close proximity to the televisions.

### Incident In Question

1. At approximately 12:45 - 1:00p.m., on 3/31/14, upon relieving himself and preparing to rise; Pearson's casted leg slipped out from under him. Having no handrail access, Pearson completely lost balance, striking his head on the stainless steel sink; directly next to the toilet.

2. Pearson struck the sink with so much force; he lost conciousness. Upon coming to, Pearson was bleeding profusely from above his right eye and nose. Inmate Keith Ray #21006-424 happened to come by, and seeing Pearson's condition he immediately pressed the duress button and went to get the officer.

3. Dizzy and disoriented, Pearson was sat up, once the officer entered the cell. (All of this was on video in order to corroborate this complaint). Five to ten minutes later medical staff arrived. Instead of being placed on a gurney, after just sustaining significant head trauma; Pearson was made to walk through the Unit out to an awaiting medical cart.

4. Pearson was examined further at health services. SIS officials took photos, and questioned Pearson as to if any physical altercation had taken place, which was the cause of his injuries. SIS Supervisor Mr. Broton, stated that the DVR review showed no foul play.

5. The Primary physician found that I had sustained a laceration on the eyeball itself, which required outside medical treatment. Pearson was taken by ambulance service to the Beckley ARH Hospital.

6. While at the Beckley ARH Hospital it was assessed by a doctor that there was a five(5) centimeter laceration over Pearson's right eye, which was attended to. Pearson was given a tetanus shot and pain killers intravenously. A CAT or CT scan was ordered and performed. The results of which were: Fracture of the orbital floor (blow-out), fractured nasal bones, concussion injury of brain, chemosis of conjuntiva, sinus hematoma, and contusion of the face.

7. The disposition decision, to transfer Pearson to Charleston Area Medical Center was made, because the Beckley ARH Hospital was not suitable to perform the surgery required. Pearson's condition was "critical" upon being transferred.

8. Upon being seen by physicians in Charleston, it was explained by the Surgeon that because of the orbital socket break, everything on the right side of my face shifted requiring emergency surgery. It was also discovered that Pearson had sustained a slight fracture/dislocation along his upper jaw. Pearson was told that this injury could probably be repaired by setting the orbital socket to its correct position; and that by doing so the wound would re-position itself properly.

9. Pearson was told, that if that form of treatment failed, a seperate surgical procedure would have to be performed. Fortunately the former procedure worked. Pearson received extensive corrective surgery and a medical "plate" the size of a guitar pick was affixed by screws to the orbital socket break.

10. This surgical procedure was performed on 4/01/2014. Post operative instructions, required the correctional facility, to follow up in Dr. Henderson's clinic in one week; for removal of nasal packings and dorsal splint. These explicit instructions were not adhered to by the Health Services Department at the corrections facility. Pearson was not taken back for weeks, even after numerous complaints that the packings were causing pain and permeating a foul odor.

11. Upon examination by Dr. Henderson, it was explained that the delayed follow up in having the packings and drainage tube removed, led to Pearson suffering from acute complications of epileptic shock.

12. Pearson was discharged, returning to FCI McDowell on 4/02/14, and placed in segregation instead of general population. The next morning, S.H.U. Lt. Mouse and several corrections officers came to the cell occupied by Pearson, and ordered for him to cuff up. Pearson complied, but inquired as to what was going on?

13. Pearson was told by Lt. Mouse, that he was being moved to a **"Hard Cell."** For those who are unfamiliar with what a **"Hard Cell"** is, Pearson shall attempt to briefly explain for the 'Reviewer.' <u>**Hard Cells**</u> are utilized for inmates who are disruptive or violent, and to Pearson's understanding they are utilized as a means of disciplinary enforcement to which Pearson should not have been subjected. To call a hard cell spartan in nature would be a compliment, barbaric would be a more suitable term. A hard cell consists of a toilet/sink combination, a large concrete slab (with no matress or other form of bedding amenities) is in the center of the cell; the shower is not in the cell like in a regular SHU cell, but is located next door to the cell.

14. Pearson again asked Lt. Mouse why the hard cell was being used to house his person, when he was just in a regular cell recovering form surgery. Pearson clearly explained, even as his face showed fresh signs of surgery, that he should not be placed in such a cell. Pearson had a drainage tube and fresh packing protruding form his nose, this alone was evidence that Pearson was in no condition to

to lay on a concrete slab.

15. Lt. Mouse stated to Pearson, "I told you that if you come back to the SHU again, you wouldn't have nothing coming, this is my house, you don't run it I do." He then went on, telling Pearson that "he would only receive a shower every seventy-two(72) hours, and that he better be fuck'en dying before thinking about hitting the duress button.

16. Pearson, in fear of his personal safety and welfare, threatened harm to himself in order for psychological services to be summoned; because Pearson felt he had no other alternative in seeking help after Lt. Mouse repeatedly denied him to speak to other prison officials. Once the two staff doctors (Dr. Stone and Dr. Tetrra) arrive, Pearson explained the events that had taken place presently. Pearson expressed to both doctors that he felt threatened by the actions of Lt. Mouse. Both doctors adamantly stated they would do nothing, and that Pearson was being manipulative in order not to stay in the hard cell. Both doctors were indifferent to Pearson's pleas for help. The doctors determined there was no need to place Pearson on (suicide) "watch," and soon thereafter they left.

17. Captain Martinez and another lieutenant then arrived in SHU, and had Pearson removed from the hard cell and into an intake holding cell. Once there, Pearson explained the events that had taken place prior to his arrival.

18. Lt. Mouse, standing close by refuted the story told by Pearson, stating that the night before Pearson allegedly refused to cell with another inmate. But, the opposite was true, the inmate whom Pearson was to cell with refused to give up his bottom bunk; as required because of Pearson's medical condition and bottom bunk pass. Captain Martinez appeared to be skeptical of Pearson's explaination, and told Pearson that in order for him to be taken from the hard cell and placed back into a regular cell he would have to forfeit his walking boot.

*Please Disregard Typo Error*

19. Captain Martinez and another lieutenant then arrived in SHU, and Pearson removed from the hard cell and into an intake holding cell. Once there, Pearson explained the events that had taken place prior to his arrival.

20. Lt. Mouse, standing close be refuted the story tld by Pearson, stating that the night before Pearson allegedly refused to cell with another inmate. But, the opposite was true, the inmate whom Pearson was to cell with refused to give up his bottom bunk; as required because of Pearson's medical condition and bottom bunk pass. Captain Martinez appeared to be skeptical of Pearson's explaination, and told Pearson that in order for him to be taken from the hard cell and placed back into a regular cell he would have to foreit his walking boot.

21. Pearson explained that without the rubber soled walking boot, he was more proned to fall; due to the slickness of the floors. Pearson explained that this absence of a waling boot is what led to his current condition. Cpt. Martinez ordered Pearson hand over the walking boot.

22. Pearson complied with the direct order, and was made to parade around the cell in order to satisfy the Captain's fancy of if or if not Pearson could manage walking without the waling boot. After almost falling, the aptain had an officer retrieve an oversized segreation shoe and had Pearson place it over the casted area. See that this solution wasn't feasible the Captain gave the walking boot back and departed.

23. A few minutes later, Pearson was cuffed, shackled, and belly chained, then taken to medical where he was examined by P.A. Goode. Pearson given clothing, and subsequently released from medical to general population a short time later.

24. Once back in general population, snide comments were made directly to Pearson by fellow staff mambers which were demeaning and unprofessional. These actions by staff fell below the standards of employee conduct, and are unbefitting of B.O.P. employees. This was

clearly a form of pyschological intimidation and abuse. Pearson suffered from not only physical, but pyschological pain as well throughout the ordeal.

Plaintiff is seek monetary damages, in the form of punitive and compensatory reward(s), for pain and suffering in both a physical and pyschological manner attributed from the incidents aforementioned

Respectfully,
Christian Pearson

Ex. A



**U.S. Department of Justice**

Federal Bureau of Prisons

*Beckley Consolidated Legal Center*

---

1600 Industrial Park Road, P.O. Box 1280
Beaver, West Virginia 25813

August 26, 2015

Christian Pearson
Register No. 04720-061
FCI Gilmer
PO Box 6000
Glenville, WV 26351

Re: Your Tort Claim No. TRT-MXR-2015-05255

Dear Mr. Pearson:

Your claim has been considered for administrative settlement under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.*, and authority granted under 28 C.F.R. § 0.172. You claim government liability in the amount of $400,000.00. Specifically, you allege that on March 31, 2014, staff at FCI Gilmer were negligent in providing you a safe environment after surgery on your ankle. You further allege you were required to stay in a three man cell without handicap accessories, which caused you to fall and suffer a broken nose, broken orbital socket, dislocated jaw and deep lacerations.

Investigation reveals that on March 10, 2014, you had surgery on your left ankle. You were evaluated by the on duty registered nurse and provided with pain medication. You were seen for a follow-up appointment on March 11, 2014. On March 13, 2014, you were provided with a lower bunk pass and crutches. On March 14, 2014, you were seen in Health Services for a follow-up appointment. At no time from March 10, 2014, until March 31, 2014, when you were seen in Health Services for an injury related to a fall did you complain that you were unable to manage in a normal housing unit.

Based on the above, your claim is denied. This is a final denial of your claim. If you are not satisfied with this determination, you have six months from the date of the mailing of this letter to bring suit in an appropriate United States District Court, should you wish to do so.

Sincerely,

Matthew W. Mellady
Regional Counsel
Mid-Atlantic Regional Office



**U.S. Department of Justice**

Federal Bureau of Prisons

*Beckley Consolidated Legal Center*

---

*1600 Industrial Park Road, P.O. Box 1280*
*Beaver, West Virginia 25813*

December 7, 2015

Christian Pearson
Register No. 04720-061
FCI Gilmer
PO Box 6000
Glenville, WV 26351

Re: Your Tort Claim No. TRT-MXR-2015-05255 Reconsideration

Dear Mr. Pearson:

This will acknowledge receipt on November 20, 2015, of your correspondence regarding the above mentioned administrative claim which we are interpreting as a request to reconsider.

Subsequent investigation reveals that after your surgery on March 10, 2014, you were evaluated by the on duty registered nurse and provided with pain medication and housed in the Special Housing Unit. You were seen for a follow-up appointment on March 11, 2014. On March 13, 2014, when you were released from SHU, you were placed in a three-man cell in a lower bunk on the lower level. In response to your request to be placed in a handicapped cell, Unit Team reviewed your medical duty status and interviewed medical staff. It was determined that you did not require a handicapped cell.

Based on the above, your claim is denied. This is a final denial of your claim. If you are not satisfied with this determination, you have six months from the date of the mailing of this letter to bring suit in an appropriate United States District Court, should you wish to do so.

Sincerely,

Matthew W. Mellady
Regional Counsel
Mid-Atlantic Regional Office

Ex.C

```
CHRISTIAN PEARSON, 04720-061
GILMER FCI    UNT: C    QTR: C03-105L
P.O. BOX 5000
GLENVILLE,  WV 26351
```



RECEIVED
FEB 01 2016
ADX Warden's Office

**Administrative Remedy No. 777431-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal wherein you allege you fell because you were not placed in a handicap cell with handholds after ankle surgery. For relief, you request to be placed in a handicap accessible cell or moved to another unit that has such a cell available.

We have reviewed documentation relevant to your appeal and, based on our findings, concur with the manner in which the Warden and Regional Director responded to your concerns at the time of your Request for Administrative Remedy and subsequent appeal. You were previously informed there was no clinical indication for you to have been assigned a handicap cell after ankle surgery. Furthermore, there was no evidence to suggest your fall was due to the fact you were not assigned to a handicap cell. Your unit team placed you in a lower bunk on the lower tier, in accordance with your medical duty status.

The record reflects you have received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons. You are encouraged to comply with proposed medical treatment so Health Services can continue to provide essential care and to contact medical personnel through routine sick call procedures should your condition change.

Considering the foregoing, your appeal is denied.

11/9/16
Date

Ian Connors, Administrator
National Inmate Appeals

Ex.C

U.S. Department of Justice  
Federal Bureau of Prisons

Central Office Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Pearson, Christian, C  04720-061  C-3  FCI Gilmer
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL** I am dissatisfied with the regional directors response. True, my Post-OP orders were to bear weight eventually but not that soon after surgery. My position on this matter is still the same as on my BP-9. I was eventually transferred to a facility to undergo therapy, my gait is not normal, I walk with a cane, how normal is that? Now I'm being transferred yet again, my leg has not healed properly. I sustained serious injury from the fall due to no handhold as would've been supplied in a handicap cell.

8-13-14                                    Christian Pearson
DATE                                        SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED  
AUG 2 2 2014  
Administrative Remedy Office  
Federal Bureau of Prisons

_____  
DATE                                         GENERAL COUNSEL  
ORIGINAL: RETURN TO INMATE                   CASE NUMBER: 777431

**Part C - RECEIPT**
                                             CASE NUMBER: _____

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION
SUBJECT: _____

_____  
DATE                SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                                                              BP-231(13)
                                                                     JUNE 2002